Christine Tartaro, Ph.D.
Distinguished Professor of Criminal Justice
Stockton University
101 Vera King Farris Drive
Galloway, NJ 08205
Christine.Tartaro@Stockton.edu
Office: 609-626-6035

Keary W. Sawyer
Sawyer Law Offices
418 Collage Ave NE
Grand Rapids, MN 49503-1706

July 24, 2023

Dear Mr. Sawyer:

Since submitting a report in July 2022, I have had the opportunity to review additional documents pertaining to the suicide of Nathan Simon while in the custody of the Eagle County Detention Facility. I hold all opinions in this report to a reasonable degree of certainty, meaning I believe they are more likely than not true. My second review included the following documents:

Depositions

- Deputy Brendan Rasmussen
- Bergon Sharp
- Undersheriff Mike McWilliam
- Sheriff James Van Beek
- Deputy Lisa Vasquez
- Deputy Scott Peterson
- Deputy Dustin Oakley
- Captain Gregory Van Wyk
- Amy Hermes
- Leah Thraikill
- Deputy Andrew Teichman

Court documents

- ECSO's Responses and Objections to Plaintiff's First set of Written Discovery
- ESCO 2nd Supplemental 26a1 Disclosures

Blumberg No. 5137
attachment 1

- ESCO 3rd Supplemental 26a1 Disclosures
- ESCO 4th Supplemental 26a1 Disclosures
- ESCO 5th Supplemental 26a1 Disclosures
- ESCO Responses to 2nd Set of Written Discovery
- Wellpath 1st Supplemental 26a1 Disclosures
- Wellpath 2nd Supplemental 26a1 Disclosures
- Wellpath 3rd Supplemental 26a1 Disclosures
- Wellpath 4th Supplemental 26a1 Disclosures
- Wellpath and Bergon Sharp Discovery Responses
- Order on Motion to Dismiss – October 27, 2022

Media coverage

- Boyd, Pam (December 10, 2018). Police, medical officials and even state law agree that jail isn't the right environment for people in mental health crisis. *VailDaily*.
- Boyd, Pam (November 18, 2018). Eagle County struggles with record number of suicide deaths in 2018.
- Williams, D. O. (9/20/19). Hard questions need to be asked in wake of Eagle County jail suicides. *RealVail.com*
- Ellis, Blake & Hicken, Melanie (June 25, 2019). Behind bars, they beg for medical attention from a giant government contractor. For some, help doesn't come – or it comes too late. A CNN investigation exposes preventable deaths and dangerous care that government agencies have failed to stop. *CNN*

Additional documents

- Transcript of Deputy Scott Peterson's car conversation – August 3, 2019
- Pre-admission waiver, medical and arrest information sheet – August 3, 2019
- August 3, 2019 911 call transcripts
- B17-207 Strengthen Colorado behavioral Health Crisis System Concerning strengthening Colorado's statewide response to behavioral health crisis and, in connection therewith, making an appropriation
- Mind Springs June 2019 report
- Mind Springs September 2019 report
- Columbia Screening Tool

Since submitting my initial report, I have also added the following relevant items to my CV:

Refereed Journal Articles

Tartaro, C. & Klenk, S. (2023). Utilizing Peer Education and Support to Prevent Suicide in Prisons. *Journal of Correctional Health Care,* forthcoming.

Tartaro, C. & Nunez, G. (2023). Has anything changed? An analysis of federal custodial litigation cases post *Kingsley v. Hendrickson. The Prison Journal,* https://doi-org./10.1177/00328855231188440

Tartaro, C., Bonnan-White, J., Mastrangelo, M. A., Erbaugh, E., & Mulvihill, R. (2023). Comparisons of beliefs in mental health stigma in communities and those who police them. *International Journal of Law & Psychiatry, 86.* https://doi.org/10.1016/j.ijlp.2022.101853

Bonnan-White, J., Tartaro, C., Mulvihill, R. & Mastrangelo, M. A. (2022). Officer Trust toward Community Members and Critical Incidents: A Comparison of Factors. *Journal of Police and Criminal Psychology.* 10.1007/s11896-022-09515-9

Book Chapters

Lester, H. D. & Tartaro, C. (2022). Culture change within facilities that incarcerate. In D. Moran, Y. Jewkes, K. Blount-Hill, & V. St. John (eds.) *The Palgrave Handbook of Prison Design.* 978-3-031-11972-9

Conference Presentations

Tartaro, C. & Alas, E. (2023). *Elements of state and federal suicide prevention policies*. Northeastern Academy of Criminal Justice Sciences Conference. Williamsport, PA.

Tartaro, C. & Alas, E. (2023). *A review of state and federal department of corrections suicide prevention Policies* (poster). Academy of Criminal Justice Sciences Conference. National Harbor, MD.

Tartaro, C. & Klenk, S. (2022). *A review of state and federal department of corrections suicide prevention policies* (poster). American Society of Criminology. Atlanta, GA.

Tartaro, C. & Nunez, G. (2022). *An analysis of federal custodial suicide litigation cases in the wake of Kingsley v. Hendrickson.* American Society of Criminology Meeting. Atlanta, GA.

This review brought additional evidence to light that I was unable to address in my first report. Specifically, these documents provide information about the deputies' awareness that Nathan Simon was suicidal, the ECDF staff awareness that detainees may lie about their suicidal intent to avoid suicide watch status, Bergon Sharp's lack of training and qualifications to conduct mental health screenings, the absence of a database to track ECSO/ECDF medical and mental health contacts and concerns, and inadequate supervision of Nathan in the hours leading up to his suicide.

**Deputies' awareness that Nathan Simon was suicidal**

It is clear from the Eagle County Sheriff's Office documentation and the depositions of Deputies Oakley, Vasquez, and Peterson that responding deputies on August 3, 2019 were aware that they were responding to a "suicidal party" welfare check. Deputies Peterson and Oakley questioned Nathan on the street that day in response to Nathan's parents' suicide party call to 911, and they were briefly joined by Deputy Vasquez. Deputy Oakley's training records reveal no training pertaining to dealing with mental health calls for service. Despite Deputy Peterson's statement in his deposition that "I've had an extensive amount of mental health training, suicide prevention" (p.11), he could not tell counsel what courses he took, nor was there any evidence of such training on his employment records. While Deputy Peterson admitted "I'm not a qualified mental health professional," he believed that "I have the ability to – to evaluate a situation to get an individual to a qualified mental health professional." (pp. 15 – 16). When pressed by opposing counsel for any type of certification or qualifications to back up his belief in his own abilities to assess people for suicidality and refer them to mental health professionals, Peterson was unable to produce any certifications or evidence of having been trained.

When Nathan was stopped by the Eagle County Sheriff's Officers on August 3, 2019, he was faced with two officers who, despite confidence in their abilities to assess someone for mental health problems, lacked training to do so. Both Oakley and Peterson were under the mistaken impression that, if an adult denies feeling suicidal, then any evidence to the contrary must be ignored. Oakley stated "As an adult, we kind of trust what we're seeing and what we're hearing from them, and especially since I hadn't had any prior contact with anybody else, as far as knowledge goes..." (p. 19). Peterson stated "We take information from third parties, and with Nathan being an adult, he can speak for himself if he's feeling self-harm or not" (p. 70).

As I mentioned in my original report, this notion that a potentially suicidal adult's word should be taken over other types of evidence certainly does not appear in any accreditation or custodial best practices documents that I have ever seen. I previously noted that I am on my county's Crisis Intervention Team (CIT) Steering Committee, but I am also trained in Mental Health First Aid and Question, Persuade, and Refer (QPR). None of these training curricula instruct people to ignore warnings from relatives. There is no logical reason for Nathan's word being taken here over dispatch classification of the 911 call, Nathan's parents' warnings that he was truly suicidal, and Nathan crying in Deputy Oakley's car. The deputies' insistence on taking Nathan at his word about his mental state is even more confusing when reading about how they doubted Nathan's honesty in two other instances. Nathan's parents told the dispatcher that he was suicidal, and they provided a physical description of him. The

police believed the physical description, stopped Nathan based on him matching that description, and did not accept Nathan's claim that he was someone named Tim, because he matched his parents' description. Nathan also initially denied drinking, but that did not deter the officers from asking for a breathalyzer, the .023 results serving as the officers' basis for taking him to jail instead of a hospital.

**Staff awareness that people are not always forthcoming about their suicidal ideation**

While Nathan's parents had no reason to lie about their son's suicidality, Nathan and other arrestees have motivation to keep information about their mental health status to themselves. While many suicidal individuals do confirm that they are unwell when directly asked about their condition, others do not. One reason why they may not be forthcoming is that they realize that others may interfere with their planned course of action. Another reason specific to individuals in the corrections setting is that mental health "treatment" and response to suicide ideation and attempts have historically been handled in a very harsh, unpleasant way. Reporter Fox Butterfield (1998) did a story for the *New York Times* about the Los Angeles County Jail's old approach to working with people with mental illness. During orientation, inmates were shown a video that encouraged them to disclose their mental health status to staff. Incarcerated individuals at all familiar with the jail at that time, however, knew that the consequence would be placement in a yellow jumpsuit that would set them apart from the rest of the inmate population and make them targets for abuse.

In my own experience working with jails, I have encountered numerous situations where suicide prevention measures in custody were humiliating and degrading, and the correctional staff were aware of it. On a tour of one NJ jail, the Lieutenant declined to take me on the suicide watch wing. He explained that the male patients were housed in flimsy paper gowns, and he was mindful that the individuals likely would not want to be seen that way. In another instance, I was working with a jail that uses the same suicide prevention outfit (the Bam Bam suit) as the Eagle County Sheriff's department. In this jail, suicidal or unstable inmates were placed in the green smocks and put in the booking areas behind a floor to ceiling Plexiglas door. Every person being booked into the jail was able to view those on suicide watch. Not only was it degrading for males to be seen by others in what was essentially a dress, but this setup allowed all the incoming detainees to identify those who are considered "weak" in the correctional culture. I brought this to the attention of the administration and encouraged them to change this stigmatizing practice. The captain argued against changing it, saying he liked that it was uncomfortable and embarrassing, since he felt it deterred anyone but the most depressed and unwell people from claiming to be suicidal. The jail maintained their policy. A few years later, I was working in the office where the mental health staff were stationed, and I heard case managers discussing how a

client confided that he was hearing voices but did not intend to tell the officers, because he feared he would be subjected to the suicide prevention regime. The mental health staff decided to inform custody so he could be placed on suicide precautions, citing the need to keep him safe over his wishes to avoid embarrassing mental health watch.

What I observed is not isolated to one or two jails. Researchers surveyed inmates in a New York State Prison and found that 42% of those in general population and 31% housed in an intermediate care program for mental illness reported that they would be unlikely to disclose mental health problems to jailers (Way et al., 2013). Researchers in New Zealand interviewed incarcerated individuals and found that they were reluctant to disclose thoughts of suicide to prison staff (Deane et al., 1999). Shea (2002) wrote a book about assessing incarcerated individuals for risk of suicide and reported numerous reasons why people would hesitate to be forthcoming with correctional staff, including their concern about being put in an unpleasant housing setting, fear that they will be labeled "crazy", conviction that no one could possibly help them, and worry that divulging this information will make it more difficult for them to commit suicide. Not only could revealing suicidal ideation to correctional staff lead to uncomfortable suicide precautions that can thwart a person's intent to commit suicide, being identified as someone experiencing mental health struggles can put individuals at risk of being victimized inside prisons and jails (Blitz et al., 2008; Encrenaz et al., 2014; Pare & Logan, 2011; Serrin et al., 2002; Wood, 2013).

To summarize, people have multiple reasons to lie about their mental health status to law enforcement and corrections officers. When Nathan first encountered Deputies Peterson and Oakley on the street, he risked involuntary hospitalization if he admitted to feeling suicidal. Once he was arrested for a bond violation, admitting to suicidal ideation carried a number of risks. First, it would have put him in a correctional suicide protocol, and those can be uncomfortable and dehumanizing. Second, being identified as suicidal or otherwise mentally ill inside a jail is likely to increase once's prospects of victimization at the hands of staff and other inmates. Third, if Nathan truly wanted to commit suicide (as he apparently did), allowing himself to be put on suicide watch might have thwarted his plans.

Did the Wellpath and ECSF/ECDF staff know that people sometime lie about their suicidality in custody? It is difficult to believe that they did not, especially given the available evidence. In his deposition, Captain Gregory Van Wyk disagreed with the statement that "it's pretty common knowledge that inmates will not share their suicidal ideation because they don't want to be placed in those environments that are what you call soft cells, correct?" Yet, prior to Nathan's death, Captain Van Wyk gave an interview for the *VailDaily* (December 10, 2018). Reporter Pam Boyd wrote "Van Wyk said a suicide threat will often land inmates in the soft cell, and chances are that's not where he or she wants

to be". Sheriff Van Beek (with the help of a ghostwriter), in his *Acts of Despair* article published in *VailDaily* on September 18, 2019, also confirmed that he was aware that incarcerated individuals are not always honest about their feelings or intentions. Van Beek wrote "We must also face the fact that many who are intent on committing suicide have learned to hide their symptoms, for fear of being stopped." Based on this information, it is reasonable to believe that the facility staff were aware that relying exclusively on the word of someone being admitted to the jail is insufficient for determining suicide risk, given that there is ample motivation for them to lie.

The Eagle County Policies provide further evidence that the county and Wellpath staff were aware that exclusive reliance on an arrestee/incarcerated individual's word was insufficient for assessing someone's medical needs. The County's Preadmissions Process section 5.7.1, states that "The Eagle County Detention Facility shall not accept official custody of a prisoner from an arresting or delivering official until pre-admission procedures are fulfilled. The procedures shall ensure that...", followed by Section B: "The prisoner has no serious illness or injury requiring immediate medical attention." Based on the 911 call and Mr. and Mrs. Simon's warning to deputies, Nathan was in clear need of immediate medical attention, yet two officers who had barely any relevant training declared Nathan to be at no risk for self-harm. In his deposition, Captain Van Wyk attempted to defend the lack of communication between transferring and custody officers by stating "it's not a violation of our policy or procedures to not share every detail and bit of information that happens on the street to the jail. That would be unrealistic" (p. 41). A 911 call for suicidal party and parents warning that their son is suicidal but will deny it is not a "bit of information". Those are clear indications of a major medical problem that, at the very least, warrants assessment by a qualified mental health professional.

In his article in the *VailDaily* a month after Nathan's death, Sheriff Van Beek lamented that "When people are being brought in, to the Eagle County Jail, we have driver's license information and prior arrest records, but no further details" and "Many times during an arrest, we have no background information about a person's physical or mental state, outside of what we witness". That is clearly not the case here. Sheriff Van Beek's officers had information about the category of 911 call and Nathan's parents' assessment of the problem, yet they ignored both. Additionally, due to an apparent lack of training, the responding deputies were unaware of other resources in Colorado for individuals who encountered the police due to mental health problems. Starting in 2017, police could take individuals suffering from mental health problems to the hospital instead of jail as a result of Colorado's Bill 17-207 *Strengthen Colorado Behavioral Health Crisis System*. When asked in his deposition, Deputy Peterson reported that he was unaware of that law. Undersheriff McWilliam argued that the reason for Nathan's

arrest instead of transfer to the hospital was that Nathan violated the terms of his bond condition by blowing a 0.023 on a breathalyzer. That is such a low amount of alcohol and such a minor offense (not even a crime but simply a violation of terms of bond) that, had deputies been trained about that law and hadn't had such an incorrect understanding of suicidality and suicide prevention, they could have used their discretion to bring Nathan to a hospital where he would have been evaluated properly.

Instead, Nathan was brought to the jail and underwent mental health screening by Bergon Sharp. In her deposition, Sharp was asked whether knowing that Nathan's detention was initiated by a suicide call would have made a difference in her assessment of him during the Receiving Screening process. Sharp responded that, had she known, she would have left Nathan in the booking area for the night and either had an on-call nurse or the morning nurse re-evaluate him. Since the transferring deputies did not share the reason for the 911 call or Nathan's parents' warnings, she placed Nathan into general population.

**Bergon Sharp's training and qualifications**

An additional problem with the deputies choosing to bring Nathan to jail instead of the hospital, as permitted by Colorado Bill 17-207, was that receiving screening at the jail was handled by someone unqualified for the task. According to the definition provided by *HCD-100_A-02 Responsible Health Authority,* Qualified Health Care Professionals (QHPs) consist of "physicians, physician assistants, nurses, nurse practitioners, dentists, dental hygienists, MA, CNAs, MH professionals, and others who by virtue of education, credentials, and experience are permitted by law to evaluate and care for patients". According to *HCD-100_B-05 Suicide Prevention and Intervention,* the portion of the Receiving Screening form that focused on metal health needed to be completed by a QHP or trained staff member. Bergon Sharp was neither a QHP nor a properly trained staff member. She is an EMT who was hired to serve as a Medication Aide for Wellpath (Formerly Correct Care Solutions). According to Sharp's deposition, her training consisted of shadowing another staff member for four to six shifts rather than any formal training curriculum. According to *HCD-100_A-02 Responsible Health Authority* 6.1.1, "staff members who work with patients are trained at time of hire to recognize verbal/behavioral cues that indicate increased risk for suicide and how to respond appropriately. Additional training on suicide prevention shall occur at a minimum of twice annually thereafter, for a total of at least two hours of suicide prevention training annually." Bergon Sharp's training logs do not show any initial suicide prevention training upon hire, nor is there any indication of training on Receiving Screening until March 2020, seven months after she screened Nathan and deemed him to be non-suicidal. Prior to making that

determination, Ms. Sharp had a total of one hour, forty-five minutes of suicide prevention training in her career with Wellpath and zero minutes of formal training on screening.

**Lack of a database to share mental health and medical concerns**

While Sheriff Van Beek testified in his deposition that the county did have a central repository where his staff could access information about past wellness calls, the county attorneys contradicted him in their responses to the first set of written discovery (June 2, 2022). The attorneys wrote "The ECSO does not maintain a central repository related to individuals with whom patrol deputies may have contact with that catalogues contacts with individuals who may have mental health issues" (p. 8). Van Beek asserted that his staff could use the dispatch CAD system to look up information, but it was left to officer discretion to do so. Deputy Teichman, who arrested Nathan on August 2, 2019, said in his deposition that it might be possible to dig into call notes, but it was a tedious process that could not easily be done. Deputy Rasmussen, who conducted Nathan's Inmate Medical Screening Report on August 2, 2019 was unaware that there was any database that he could use to learn more about individuals' involvement in mental health calls. Deputy Vasquez, who also responded to the 911 suicidal party call on August 3, 2019, was also unaware that such a database existed. While Deputy Peterson did acknowledge that the CAD system could be used to look up information about prior mental health calls for an individual, he reported he could not recall ever using it for that purpose. If the Sheriff expected officers to use this system to identify people who are at risk for suicide in custody, the deputies needed to be trained that it was possible and informed that they needed to do that.

**Inadequate supervision of Nathan on August 3, 2019**

Jails typically have policies outlining specific timelines for required watches. ECDF staff provided inconsistent responses about their understanding of the policies at the jail on the day that Nathan died. Deputy Rasmussen indicated that the supervision policy "Was every 30 minutes... We were required to check every 30 minutes – if they were locked down w/in their cell, yes." (p. 30). Captain Van Wyk contradicted his deputy and stated "Inmates in general population are not required to be checked every half an hour. There's no policy indicating a requirement to check on all inmates every half an hour" (p. 52). Sheriff Van Beek, in his deposition, stated that officers "should" do 30-minute checks but are "allowed some latitude." The county provided a vague answer to this question in their response and objections to plaintiff's first set of written discovery on June 2, 2022. When asked about the monitoring policy in place on August 5, 2019, the county attorneys responded "Deputies monitor detainees and inmates in the Jail's general population by interacting with them throughout the day. Head counts are performed twice daily at 5:30am and 5:30pm. Deputies conduct periodic walkthroughs of each pod at

random times and further engage with detainees and inmates during recreation times, for medical calls, and for myriad other reasons" (p. 4). A review of Nathan's incarceration log on the day of August 5, 2019 reveals that he was unmonitored for over two hours prior to his body being discovered. Two hours is a much longer time than the 30-minute checks that Sheriff Van Beek said officers "should" be doing, and two hours is more than "some latitude" from 30-minute checks. According to the county's response on the required frequency of checks, there were supposed to be interactions between deputies and inmates throughout the day, including periodic walkthroughs of the pods at random times. In my 25 years of working and studying in corrections, I have never heard of two hours being an acceptable time period between checks for any type of supervision of inmates inside their cells.

Signed:

Date: July 24, 2023

Works cited

Blitz, C. L., Wolff, N., & Shi, J. (2009). Physical victimization in prison: The role of mental illness. *International Journal of Law and Psychiatry, 31*(5), 385 – 393.

Butterfield, F. (1998, March 5). By default, jails become mental institutions. *New York Times.* Retrieved from www.nytimes.com/yr/mo/day/early/030598prisons-mental-health.html.

Deane, F. P., Skogstad, P., & Williams, M. W. (1999). Impact of attitudes, ethnicity and quality of prior therapy on New Zealand male prisoners' intentions to seek professional psychological help. *International Journal for the Advancement of Counseling, 21*, 55 – 67.

Encrenaz, G., Miras, A., Contrand, B., Galera, C., Pujos, S., Michel, G., & Lagarde, E. (2014). Inmate-to-inmate violence as a marker of suicide attempt risk during imprisonment. *Journal of Forensic & Legal Medicine, 22*, 20 – 25.

Pare, P. P. & Logan, M. W. (2011). Risks of minor and serious violent victimization in prison: The impact of inmates' mental disorders, physical disabilities, and physical size. *Society & Mental Health, 1*(2), 106 - 123.

Serin, R. C., Motiuk, L., & Wichmann, C. (2002). An examination of suicide attempts among inmates. *Forum on Corrections Research, 14*(2), 40 – 42.

Shea, S. C. (2002). *The practical art of suicide assessment: A guide for mental health professionals and substance abuse counselors.* New Jersey: Wiley.

Way, B. B., Kaufman, A. R., Knoll, J. L., & Chlebowski, S. M. (2013). Suicidal ideation among inmate-patients in state prison: Prevalence, reluctance to report, and treatment preferences. *Behavioral Sciences & the Law, 31,* 230 – 238.

Wood, S. R. (2013). Dual severe mental and substance use disorders as predictors of federal inmate assaults. *The Prison Journal, 93*(1), 34-56.