IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 21-cv-01923-GPG-KAS

ESTATE OF NATHAN TIMOTHY SIMON, by and through its personal representative,
TIMOTHY SCOTT SIMON;
TIMOTHY SCOTT SIMON, individually; and
BERNADETTE MARY SIMON, individually;

    Plaintiffs,

v.

SHERIFF JAMES VAN BEEK, in his official capacity;
CAPTAIN GREGORY VAN WYK, in his official capacity;
UNDERSHERIFF MIKE MCWILLIAMS, in his official capacity;
DEPUTY SCOTT PETERSON;
DEPUTY DUSTIN OAKLEY;
EAGLE COUNTY SHERIFF'S OFFICE; and
EAGLE COUNTY DETENTION FACILITY;

    Defendants.

**ORDER**

Before the Court is ECSO Defendants' Motion for Summary Judgment (Motion) (D. 228) filed by all Defendants and seeking judgment on the federal claims and dismissal of the remaining state law claims. For the reasons set forth below, the Court GRANTS the Motion.

**I. PROCEEDURAL BACKGROUND**

This civil action arises from the suicide of Nathan Timothy Simon on August 5, 2019, while he was a pre-trial detainee at the Eagle County Detention Facility (the Jail) (*see* D. 59). On July 7, 2021, Nathan's estate, his father (Plaintiff Timothy Scott Simon), and his mother (Plaintiff Bernadette Mary Simon) filed this lawsuit alleging that Defendants improperly failed to provide

1

medical care to Nathan or place him on suicide watch (D. 1). The case initially included other parties and claims that have been dismissed (*id*.).[1]

On October 27, 2022, the Court denied a motion to dismiss filed by Sherriff James Van Beek, Captain Gregory Van Wyk, Undersheriff Mike McWilliams, Deputy Scott Peterson, Deputy Dustin Oakley, the Eagle County Sheriff's Office (ECSO), the Jail, and the Eagle County Board of Commissioners (collectively, ECSO Defendants) (D. 122). The Court found that the individual ECSO Defendants (Van Beek, Van Wyk, McWilliams, Peterson, and Oakley) were not entitled to qualified immunity (*id*. at 10), that Plaintiffs had sufficiently alleged claims for supervisory liability (*id*. at 12), and that Plaintiffs had sufficiently alleged municipal liability (*id*. at 13).

The individual ECSO Defendants filed an interlocutory appeal to the U.S. Court of Appeals for the Tenth Circuit regarding the denial of qualified immunity on Plaintiffs' individual and supervisory liability claims (D. 123). The Tenth Circuit reversed the Court's decisions, finding that the individual ECSO Defendants were all entitled to qualified immunity for the claims against them in their individual capacities (D. 222). *Est. of Simon by & through Simon v. Van Beek*, No. 22-1389, 2023 WL 8544800, at *6 (10th Cir. Dec. 11, 2023) (*Simon 10th Cir*.). Thus, all of

---

[1] Plaintiffs raised fourteen claims: (1) violation of the Fourteenth Amendment through 42 U.S.C. § 1983 against Defendants Van Beek, McWilliams, Van Wyk, Peterson, Oakley, and Sharp in their official capacities; (2) negligent operation and dangerous conditions of a jail, in violation of Colorado Revised Statute § 24-10-106 *et. seq.*, against Defendant Van Beek, McWilliams, Van Wyk, and Peterson; (3) negligent and/or willful, wanton and reckless misconduct, in violation of Colorado Revised Statute § 24-10-106 *et. seq.*, against EMT Bergon Sharp; (4) violation of the Fourteenth Amendment through 42 U.S.C. § 1983 against Correctional Healthcare Companies (CHC); (5) negligence against CHC; (6) breach of contract by CHC under Colorado Revised Statute § 24-10-106 *et. seq.*; and (7) negligence by the Eagle County Board of Commissioners under Colorado Revised Statute § 24-10-106 *et. seq*. (D. 59 at 15-40).

2

Plaintiffs' claims against the individual ECSO Defendants in their individual capacities have been dismissed.[2]

This case was then reassigned to the Undersigned upon appointment as a United States District Judge (D. 174). The remaining federal claims consist of those brought against the individual ECSO Defendants in their official capacities, the Jail, and the ECSO under theories of municipal liability (*see* D. 59). Additionally, Plaintiffs maintain several state law claims against the ECSO Defendants (*id*.). All other parties named as defendants have been dismissed (D. 211, 221).

By their Motion, ECSO Defendants seek summary judgment on all of Plaintiffs' municipal liability theories and request that the Court decline supplemental jurisdiction over Plaintiffs' state law claims (D. 228 at 1). Plaintiffs' respond that ECSO Defendants' "lack of policy, failure to implement, communicate, train, lack of database and the totality of circumstances resulted in Nathan's death" (D. 235 at 3).

## II. FACTUAL BACKGROUND

The Parties' briefing presents issues for determining what factual disputes exist. In their Response, Plaintiffs failed to comply with the Court's Practice Standards requiring that the "party opposing the motion for summary judgment shall, in a section of the brief styled 'Response to Statement of Undisputed Material Facts,' admit or deny the movant's asserted material facts." GPG Practice Standard 7.1D(b)(5). The Court, nonetheless, "accept[ed] the statements made by Plaintiff[s] as a denial of each of Defendant[s'] asserted material facts" (D. 237). Plaintiffs made

---

[2] The defense of qualified immunity "is available only in suits against officials sued in their personal capacities, not in suits against . . . officials sued in their official capacities." *Starkey v. Boulder Cty. Soc. Servs.,* 569 F.3d 1244, 1263 n. 4 (10th Cir. 2009); *accord Becker v. Bateman,* 709 F.3d 1019, 1022 (10th Cir. 2013).

3

factual assertions regarding allegedly material policies and practices of ECSO and material undisputed facts (D. 235 at 4, 7). Plaintiffs' asserted facts, however, in many instances lack evidentiary support, as discussed below.[3] Further, Plaintiffs' asserted facts are leave out the context[4] provided by the narrative facts in the Motion, many of which appear undisputed or are explicitly undisputed (*see id*. at 17 ("Plaintiffs do not dispute those two facts")). Consistent with the requirement that the Court view the facts in the light most favorable to the non-movant, the Court has assembled a factual narrative that reflects Plaintiffs' assertions insofar as they are supported by the summary judgment record and those undisputed facts necessary for narrative context.

### A. Prior Suicides at Eagle County Detention Facility and Official Policies

One inmate died by suicide through hanging at the Jail in each of 2012 and 2014 (D. 235 at ¶ 2). The Jail's present policies were adopted after these events. There have also been unsuccessful suicide attempts at the Jail. On January 22, 2018, Van Beek adopted a revised suicide prevention guideline which stated, "should staff hear or observe signs that an inmate may be suicidal, the inmate shall be immediately placed on suicide watch and referred to mental health staff for assessment. Staff shall inform the shift supervisor of any threat or concern of suicide" (D. 235 at ¶ 1). Detention facility staff must take all suicide threats or actions seriously (D. 235 at ¶ 13). The Sheriff (Van Beek), Undersheriff (McWilliam), and Captain (Van Wyk) oversaw training and supervising the Jail employees and implementing policy (D. 235 at ¶ 10).

---

[3] Additionally, many of Plaintiffs asserted facts are so case-specific as to be of little relevance in the municipal liability context. For example, Plaintiffs note that "Deputy Peterson *did not recall* any policies or procedures *created by Sheriff Van Beek* for how to respond to a suicide call *from a parent*" (D. 235 at ¶ 22 (emphasis added)).

[4] For example, Plaintiffs asserted facts do not state that Nathan committed suicide, only that he died and was "found hung in his cell" (D. 235 at ¶ 49).

As Sheriff, Van Beek is ultimately responsible for the policies that are developed and implemented at the ECSO, including the suicide prevention policies (D. 235 at ¶ 12).  He is also responsible to make sure the Jail staff and road patrol staff are properly trained to perform their duties (D. 235 at ¶ 11).  As part of this responsibility, the Sheriff is responsible to ensure the arresting and detaining deputies (i.e., road patrol staff) are taught that, when "presenting a detainee or arrestee on intake at the detention center, that they need to report mental health/safety concerns" (D. 235 at ¶ 14).  Deputies are required to "advise receiving personnel about any medical or unusual security risks" (D. 235 at ¶ 6).

Road patrol staff, in their discretion, are required to make competent, responsible and reasonable decisions that will withstand review by the deputy's supervision (D. 235 at ¶ 5).  ECSO maintains a database of past incidents, including interactions with individuals presenting a suicide risk, that can be checked by patrol deputies.  It is not the policy of the ECSO to do such database checks, and it is left to the officer's discretion to access any database information (D. 235 at ¶ 21).

**B.  Nathan's Arrests and Suicide**

On April 4, 2019, Nathan's girlfriend, Karlie Cummins, reported that Nathan was suicidal and texted that he wanted to kill himself (D. 235 at ¶ 1).  Nathan was provided a number for the Hope Center[5] and Nathan's parents were advised of the situation and resources[6] (*id.*).

On June 6, 2019, Nathan was taken into custody by the ECSO for second degree burglary and possession of a controlled substance (D. 235 at ¶ 2).  On June 30, 2019, Ms. Cummins wrote

---

[5] The Parties do not explain what the Hope Center or the Bridges Program (discussed below) are.  The Court assumes from context that they provide mental health services, although it has no bearing on the Court's decision.

[6] Plaintiffs' brief says "recourses," but in context this appears to be a typo (D. 235 at ¶ 1).

5

Ivette Rosales of the ECSO an e-mail stating that Nathan had become increasing depressed, she suspected he was drinking more, and he had drugs (D. 235 at ¶ 3).  Officer Sutton of the ECSO investigated the report.  Nathan was referred to the Hope Center again and the parents were asked to watch Nathan all night until the Hope Center was available (D. 235 at ¶ 4).  On August 2, 2019, Nathan was arrested for felony theft and burglary.  He bonded out the next day, August 3.

On August 3, Nathan's parents (Plaintiffs Timothy and Bernadette Simon) reported their concern that Nathan was suicidal.  Defendants Scott Peterson and Dustin Oakley (Patrol Deputies) of ECSO responded to the report.  They knew that they were responding to a report that Nathan was suicidal and asked Nathan about his mental state.  Nathan said he was "having a hard time," that "there were some rough spots with him and his girlfriend," and things were "rough at home, [because] he was still living at his parents'" house (D. 235 at ¶ 26).  But he denied being suicidal, and the Patrol Deputies believed him.  Nathan admitted to drinking alcohol, which violated a condition of his release, and the Patrol Deputies arrested him for the bond violation.  Timothy asked whether there would be a suicide protocol for Nathan at the Jail.  Peterson responded that he did not believe Nathan was suicidal.  Bernadette told the Patrol Deputies that Nathan was suicidal and that they should not believe his denials.

Oakley took Nathan to the Jail.  There, Oakley again asked Nathan if he was suicidal, and he denied being suicidal. Defendant Deputy Steven Cowles then completed the Inmate Medical Screening Report, which reflects that Nathan had not previously attempted suicide, was not thinking about suicide, had not been hospitalized previously for psychiatric issues, was not taking any prescription medications, and appeared to be intoxicated (D. 228-1 at 19–20).  Thereafter, former defendant EMT Bergon Sharp (an employee of former defendant Wellpath), completed a

6

mental health receiving screening.  EMT Sharp and Wellpath were hired by ECSO to do suicide screening (D. 235 at ¶ 25).  Nathan denied being suicidal or having suicidal thoughts.  EMT Sharp medically cleared Nathan and did not refer him for mental health or other medical services.  Nathan was admitted into the Jail's general population without any special anti-suicide precautions.  The Jail assigned him to a single person cell with a high bar over a window and provided him with bedsheets.  This would not have occurred if the Jail determined that he presented a suicide risk and, instead, the Jail would have taken suicide-prevention measures.

Between the time he entered general population and his death on August 5, 2019, Nathan did not alert any Jail staff that he was suicidal.  Nathan played handball and used the gym.  A later investigation revealed that other inmates had seen behaviors indicative that Nathan was potentially suicidal, such as sitting alone while showering, but these were not reported to Jail staff.

On August 5, 2019, Nathan attended a bond hearing where Colorado District Judge Rachel J. Olguin-Fresquez referred Nathan to the Bridges Program, noting people's concern for his safety.  A report of this hearing was sent to ECSO.  Nathan returned to his cell around 1:00 p.m. and put a towel over his cell window.  At approximately, 5:00 p.m., a deputy passing out dinner trays found Nathan unresponsive in his cell with a bed sheet fashioned as a ligature around his neck.  Jail personnel and emergency service responders took immediate steps to revive Nathan but were unsuccessful.

Since the death of Nathan, three additional inmates have hung themselves at the Jail (D. 235 at ¶ 28).  No changes to the screening process for arrestees have been made since Nathan's suicide (D. 235 at ¶ 29).

### III.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must consider the factual record and reasonable inferences based on said record "in the light most favorable to the non-moving party." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).  The moving party bears the burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*  If the moving party meets this burden, the opposing party must go beyond the pleadings and designate evidence showing there is a genuine triable issue.  *Celotex*, 477 U.S. at 323–24.  Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

### IV.  ANALYSIS

**A.  Jail Suicide Municipal Liability Claims in the Tenth Circuit.**

"[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cty.*, 119 F.3d

8

862, 866 (10th Cir. 1997).  Such claims are judged against the deliberate indifference to serious medical needs test.  *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015).  Under this test, a constitutional violation occurs when a prison official or prison medical provider acts with deliberate indifference to a substantial risk of harm to inmate health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[7]  "A claim of deliberate indifference includes both an objective and a subjective component."  *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014).  A plaintiff must satisfy both components.  *Rife v. Oklahoma Dept. of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017).

Under the objective prong, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  "[E]xtreme deprivations" are required to make out a conditions-of-confinement claim.  *Hudson v. McMillian,* 503 U.S. 1, 8-9 (1992).  The Eighth Amendment is not implicated unless the conditions deprive a prisoner of the "'minimal civilized measure of life's necessities.'"  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Moreover, the "Eighth Amendment 'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'"  *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (citation omitted).

---

[7] This test was originally created in the context of the Eighth Amendment, which applies after conviction; however, the same test applies under the Fourteenth Amendment to pre-trial detainees, such as in this case.  *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985) ("Nevertheless, pretrial detainees are in any event entitled to the degree of protection against denial of medical attention which applies to convicted inmates.").

Suicide satisfies the objective component. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (observing that death, "without doubt," is "sufficiently serious to meet the objective component" (citation omitted)). The Court, therefore, will only analyze the subjective component.

To satisfy the subjective component, a plaintiff must show that a prison official knew of and disregarded an "excessive risk" to his health or safety by failing to take reasonable measures to abate it. *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quotations omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (brackets omitted) (quoting *Farmer*, 511 U.S. at 837). A factfinder may conclude a prison official knew of a substantial risk when the risk was obvious. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022).

Municipal institutions are "persons" subject to suit under Section 1983. *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 800 (10th Cir. 2019). However, a municipality cannot be sued under Section 1983 "for an injury solely inflicted by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Instead, municipal liability requires that a municipal policy or custom was the moving force behind the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). Thus, to plead a claim against a municipality under Section 1983, a plaintiff must allege that: "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) (citing *Schneider v. City of Grand Junction Police Dep't*, 717

10

F.3d 760, 769–71 (10th Cir. 2013)).  Plaintiff may demonstrate a municipal policy or custom through several methods, including: (1) a formal regulation or statement, (2) informal custom that amounts to a widespread practice, (3) decisions of employees with final policymaking authority, (4) ratification by policymakers of decisions of subordinates, or (5) the failure to adequately train or supervise employees in a way that amounts to deliberate indifference.  *See Waller v. City & Cty. Of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019) (quotation marks omitted).  "Municipal liability is 'most tenuous where a claim turns on a failure to train.'"  *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).[8]

A municipality's failure to train its police officers rises to the level of a municipal "policy or custom" only when it evidences the municipality's "deliberate indifference" to the rights of its inhabitants.  *Connick*, 563 U.S. at 60.  Typically, a "pattern of similar constitutional violations by untrained employees is . . . 'necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* at 62 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).  It is unnecessary to plead a pre-existing pattern of violations only in the "rare" cases where "the unconstitutional consequences of failing to train" are "patently obvious."  *Id.* at 64.  The failure-to-train analysis focuses on "the adequacy of the training program in relation to the tasks the particular officer must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability" on the municipal entity.  *City of Canton*, 489 U.S. at 390.

---

[8] Failure-to-supervise and failure-to-train claims are functionally similar and involve the same elements.  *Rehberg v. City of Pueblo*, No. 10-CV-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012).  The court therefore addresses these theories together.

### C. Plaintiffs' Practice or Custom Theories

In their Response to the Motion, Plaintiffs articulate their claim that a practice or custom of the Sheriff's Office and ECDC caused Nathan's suicide in several ways. Plaintiffs assert that the "Jail's practice and custom of giving deputies discretion to decide who is suicidal or not, and permitting deputies to determine whether any information related to suicide evaluation is communicated to the mental health professional conducting the suicide screening at intake" reflects deliberate indifference (D. 235 at 16). They then assert that "Nathan Simon was the victim of a long-standing practice and custom by the ECSO to ignore the medical needs of their inmates" (*id*. at 19). Plaintiffs assert that it "was customary for [ECSO] not to follow their written procedures" (*id*. at 21). They also refer to a "casual approach to safety that was a custom and practice in a lack of training and lack of supervisory oversight" (*id*. at 22).[9]

When these arguments are considered in the context of the facts put forward in Plaintiffs' "Material Policies and Practices" section, Plaintiffs put forward two theories regarding Defendants' policies and customs. First, Plaintiffs assert that the official policies committed too much discretion to officers and other non-medical personnel to make determinations about whether a detainee was suicidal, including leaving it to officer discretion to review databases of information about detainees that may contain such information and to convey whether a person was reported as suicidal. Second, Plaintiffs assert that Defendants had a custom and practice of ignoring

---

[9] Additionally, "Plaintiffs contend and the record shows that there was a complete lack of communication at the ECSO in practice and custom" (D. 235 at 18), but there is no record evidence or argument supporting this generalization or that ECSO did not comply with its practice of advising receiving personnel about known medical or security risks (*see id*. at 5, ¶ 6).

information about inmate health, including suicide risk, that led to ignoring information available to them about Nathan's suicide risk as well as signs that he might be suicidal.

   1. *The existence of policies and customs*

The facts presented in the record show that Defendants official policies and accepted practices committed many decisions related to Nathan's and other detainee's potential suicide risk to officer and Jail employee discretion. These facts are not materially disputed and show that the arresting officers had discretion to determine whether a detainee was a suicide risk and report only known risks to health and safety.

Plaintiffs' assertions that there was a custom and practice of ignoring information about inmate health and of ignoring written procedures lack the sort of supporting evidence necessary at this stage. "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is . . . a well-settled custom or practice." *Schneider*, 717 F.3d at 770 (citation omitted). But, to show that an unofficial custom or practice is attributable to the municipality entity, a plaintiff must show that it is "so permanent and well settled as to constitute a custom or usage with the force of law." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023) (internal quotations omitted). Plaintiffs present specific facts related to the circumstances of this case, but do not present facts showing that similar events were a widespread or a permanent feature of ECSO's operations. Although Plaintiffs highlight the other suicides at the Jail, there no specific facts in the record to indicate that these events involved ignoring information about detainee health or that the Jail otherwise had a custom of doing so. *See George*, 32 F.4th at 1258 (holding a municipal custom or practice had not been shown because "Plaintiff does not attempt to prove a pattern evidencing that custom").

Further, Plaintiffs lack evidence that ECSO ignored its written procedures in this case. Their argument appears premised on there being a written policy of checking detainee cells every thirty minutes and preventing inmates from covering the windows of cells (D. 235 at 7). But the cited evidence does not support these asserted facts. Instead, it shows that the thirty minute checks policy only applied during lockdowns, which did not occur here, and that detainees are allowed to use a towel over a window to "have a brief moment of privacy if they're using the bathroom or if they're possibly trying to darken their cell a little bit to rest" (D. 235-1 at 30, Van Beek Depo. 46:2–10). The evidence in the summary judgment record is not evidence from which a reasonable jury could conclude that ECSO had a well-settled practice of ignoring detainee health or its own policies. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 791 (10th Cir. 2010) (affirming a grant of summary judgment because the evidence was insufficient to "give rise to an inference of a widespread City practice of fabricating results and concealing evidence").

    2. *Causation*

Despite the limited policies that Plaintiffs have shown with record evidence, viewing the facts in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that ECSO' policies were a but-for cause of Nathan's suicide. Defendants' established policies and practices gave the arresting officers discretion to make their own determination regarding whether Nathan was suicidal. In making this determination, the arresting officers had discretion not to consult databases of information containing information about Nathan's past suicidal behavior that could have led them to conclude he presented a risk of suicide notwithstanding his denials of suicidal thoughts. The discretionary determination of the arresting officers that Nathan was not suicidal led to a failure to report suicide risk at intake because the officers were required to report

known risks, not surrounding circumstances that could have led those at intake to make a different determination of suicide risk. Finally, a reasonable jury could conclude that Nathan would have been considered a suicide risk and put on a successful suicide watch had different policies existed because of the Jail's suicide prevention practices used for detainees known to present a risk of suicide.

### 3. Deliberate Indifference

The final issue with respect to this policy is whether ECSO adopted or maintained its policies with deliberate indifference to the risk of suicide occurring. *George*, 32 F.4th at 1253. Plaintiffs argue that circumstantial evidence indicates that the "known or obvious consequences" of Defendants' policies indicate deliberate indifference to detainees' health and safety (D. 235 at 19). Plaintiffs point to the suicides at the Jail and all the information known about Nathan's suicide risk as suggesting deliberate indifference (*id*. at 20–23).

These arguments miss the mark.[10] "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Schneider*, 717 F.3d at 771 (quotation marks omitted).

---

[10] Plaintiffs' arguments regarding Defendants' awareness of Nathan's suicide risk appear to be directed at the issue of supervisory liability (D. 235 at 18 ("Furthermore, the law is clear that supervisors' actions can constitute a constitutional violation regardless of supervisory liability because the two legal theories are separate and distinct.") and at 21–22), which the Tenth Circuit has already resolved. *See Simon 10th Cir*., 2023 WL 8544800, at *5–*6. In the supervisory liability context, it is relevant whether a prison official "had actual knowledge of an individual inmate's substantial risk of suicide." *George*, 32 F.4th at 1256. After the Tenth Circuit's mandate and the dismissal of the other defendants, the remaining federal issue is whether Plaintiffs have presented sufficient evidence to support their theories of municipal liability. Plaintiffs may be seeking to argue that this case presents the "rare" and "narrow range of circumstances" where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction" to permit Plaintiffs to proceed on a failure-to-train theory without showing a pattern of unconstitutional conduct. *Waller*, 932 F.3d at 1284 (quoting *Barney*, 143 F.3d at 1307-08). But, particularly considering Plaintiffs failure to show policy violations, this case does not reflect such circumstances.

"[I]n most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id*. Plaintiffs showed that other detainees or inmates at the Jail have committed suicide[11] but do not present evidence that these suicides were tortious, that is, evidence that the other suicides resulted from constitutional violations (D. 235 at 4, 7). Indeed, Plaintiffs do not provide reasons that these incidents constitute a pattern by identifying similarities between the suicides at the Jail (*id*.). As such, there is no reason to suspect, much less infer, that these other incidents were similar to the present case, such as by relating to the discretion of arresting officers or the Jail's intake procedures. *See Est. of Kowalski v. Shrader*, No. 21-CV-00827-NYW, 2022 WL 19422, at *17–*18 (D. Colo. Jan. 3, 2022). Accordingly, the evidence presented by Plaintiffs does not show that the enactment or maintenance of ECSO's policies and practices "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411.

### D. Plaintiffs' Failure to Train and Supervise Theories

Plaintiffs argue that "[l]imited or no training was provided to ECSO deputies or detention staff" and that non-Jail staff received "no required courses or training in mental health or suicide" (D. 235 at 2). Plaintiffs note that Van Beek and Oakley did not have training on suicide prevention through ECSO (*id*. at 4, 11–12).[12] Plaintiffs also assert that there was "no monitoring or

---

[11] Each of these suicides, including Nathan's, represents a terrible human tragedy that cannot be remedied. The number of such suicides at a relatively small facility is extremely concerning and should be taken seriously by all, even when the evidence presented here does not support a finding of a constitutional violation of this type. The Court does not discuss the suicides that occurred after Nathan's because precedent suggests that later incidents are not relevant to determining deliberate indifference. *Waller*, 932 F.3d at 1289. Regardless, the Court's ruling should not be read to find that there is no pattern to the incidents of suicide at the Jail, only that no pattern of similarity is shown by the evidence in the record here.

[12] Plaintiffs assert that EMT Sharp had limited hours of suicide prevention training, but the cited evidence does not support this conclusion (*id*. at 13, D. 235-1 at 86–87, Sharp Depo. 14:15-15:10). Plaintiffs argue that the "two patrol

16

enforcement of 'policies'" and the officers "failed in the practice of the proper suicide protocols" (id. at 4, 24). According to Plaintiffs, "[o]bviously, different and better training was required to prevent the[] unnecessary deaths" at the Jail (*id*. at 24).

There is little in Plaintiffs' brief or the record about what such "different and better" training should have consisted of. The Court can infer from Plaintiffs' brief that such training would, in some fashion, relate to improving ECSO employees' ability to detect signs of suicide risk and result in them being less likely to believe detainee's a denials of suicidal ideation (*e.g.*, D. 235 at 23 ("Given Nathan's prior suicidal tendencies and actual complaint by his parents that he was suicidal, Nathan should have been placed in the suicide protocol and watched by the [Jail] staff.")). The record evidence supports an inference that training would better equip ECSO employees to understand signs of suicide risk. But that evidence is a catch-22. Cowles, who screened Nathan at the Jail, testified that he was trained to recognize various signs of suicide risk (D. 235-1 at 26, Cowles Depo. at 17:3–23). Despite his training, he cleared Nathan.[13] On this record, there is no reason to infer that Nathan's distress about his relationship and living situation—or the comments by his parents that he was lying—would have been viewed by the officers differently even in view of more or better training.

Similarly, as discussed above, the record evidence does not support a conclusion that the Patrol Officers or anyone else violated ECSO policy in a way that was material to the outcome.

---

deputies [were] without any medical or mental health training," but Plaintiffs do not put forward facts that would support this as to both Oakley and Peterson (D. 235 at 20). Plaintiffs assert that Cowles had no suicide prevention training (*id*. at 11), but he gave unchallenged testimony about the training that he received (D. 235-1 at 26, Cowles Depo. at 17:3–23).

[13] Similarly, EMT Sharp also had such training and cleared Nathan.

17

Thus, because evidence of a policy violation has not been shown, any failure to properly train or supervise officers to follow policies is irrelevant because it cannot have caused the incident. Thus, the evidence in the record does not raise a dispute of material fact that either the lack of potential better training or supervision was the but-for cause of Nathan's suicide. *See Brown*, 520 U.S. at 404 (holding a *Monell* plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). This conclusion is consistent with the result reached in numerous other cases that have found that simply asserting that better training or supervision would have prevented the alleged constitutional violation is insufficient. Ultimately, the Supreme Court and Tenth Circuit have rejected Plaintiffs' argument, and the Court is bound to follow their decisions.[14]  "While [ECSO] could have offered more or better suicide-prevention training, 'showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.'" *George*, 32 F.4th at 1254 (10th Cir. 2022) (quoting *Connick*, 563 U.S. at 68); *see also Taylor v. Barkes*, 575 U.S. 822, 826 (2015) ("No decision of

---

[14] Plaintiffs assert that the deposition testimony of their expert witness that the "lack of policies and procedure put in place by the supervisory officers that teaches officers what to convey constitutes deliberate indifference" creates a material issue of fact (D. 235 at 25). But, in the deposition testimony, the expert merely indicates that the individual officers' failure to convey information constituted deliberate indifference (D. 235-1 at 115). He may be correct, but the Tenth Circuit found that the law on this issue was not clearly established and granted qualified immunity. *See Simon 10th Cir.*, 2023 WL 8544800, at *5. In the deposition testimony, the expert criticizes the lack of policies and procedures that allowed this to happen, but he does not assert that the failure to enact such policies was deliberate indifference:

> Q. (BY MR. WALSH) Okay. And what is your criticism?
> A. My criticism is that the, for whatever 5 reason, lack of policy and procedure or specific training that teaches officers what's important to convey, because of those issues, was not -- was not accomplished.
> Q. Okay. And do you believe that wasn't accomplished that constitutes deliberate indifference?
> A. In my opinion
> MR. GOLDFARB: Form and foundation. Calls for a legal conclusion.
> A. In my opinion, yes.

(*Id.*, Hilsop Depo. 248:2–14). Thus, the record does not support Plaintiffs' argument.

18

this Court establishes a right to the proper implementation of adequate suicide prevention protocols."). Because Defendants have shown that they are entitled to judgment as a matter of law, the Court grants summary judgment on Plaintiffs' federal claims.

### E. The Court Declines Jurisdiction over Plaintiff's Remaining Claim

"The Supreme Court has instructed us that federal courts should consider the propriety of exercising supplemental jurisdiction 'in each case, and at every stage of the litigation.'" *Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d at 1237 (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)). Under similar circumstances, "the most common response to a pretrial disposition of federal claims has been to dismiss the state law claim or claims without prejudice—that is the seminal teaching of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726[] (1966), reconfirmed in [*Carnegie–Mellon Univ.*, 484 U.S. at 350,] and repeated in a host of cases such as *Sawyer v. County of Creek*, 908 F.2d 663, 668 (10th Cir.1990)." *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995). Accordingly, the Court grants the Motion, declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and dismisses those claims without prejudice.

### V. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (D. 228) is GRANTED. It is ORDERED that, pursuant to Rule 56(a), SUMMARY JUDGMENT shall enter in favor of Defendants and against Plaintiffs on Plaintiffs' Counts I, III, V, VII, and VIII. It is further ordered that Plaintiffs' remaining claims are DISMISSED without prejudice. It is FURTHER ORDERED that the Clerk of the Court shall close this case.

DATED October 25, 2024.

BY THE COURT:

Gordon P. Gallagher
United States District Judge